**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| HEATHER McQUADE,<br><br>                    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                    Defendant. | CASE NO. 1:21-cv-00834<br><br>DISTRICT JUDGE CHRISTOPHER A. BOYKO<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Heather McQuade ("Plaintiff" or "Ms. McQuade") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On September 25, 2019, Ms. McQuade filed an application for DIB, alleging a disability onset date of December 17, 2018.  (Tr. 15, 60, 156.)  She asserted that she was disabled due to connective tissue disorder unspecified, acquired hypothyroidism, Hashimoto's Thyroiditis, microscopic colitis IBD, lupus, SLE, seronegative RA, chronic migraines, iron deficiency / anemia, Raynaud's Syndrome, lymphocytic colitis IBD along with IBS-D, and bursitis.  (Tr. 60, 61, 87, 103, 185.)  Her application was denied at the initial level (Tr. 83-87, 89-92) and upon

reconsideration (Tr. 99-103).  She then requested a hearing.  (Tr. 112-14.)  On November 12,

2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 38-59.)

On December 1, 2020, the ALJ issued an unfavorable decision, finding Ms. McQuade

had not been under a disability from December 17, 2018 through the date of the decision.  (Tr.

12-37.)  Ms. McQuade requested review of the decision by the Appeals Council. (Tr. 153-55.)

On March 16, 2021, the Appeals Council denied Ms. McQuade's request for review, making the

ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II. Evidence

The ALJ identified severe physical impairments (Tr. 17) and nonsevere mental

impairments (Tr. 18-20).  Ms. McQuade's two assignments of error relate to her alleged physical

impairments and two medical opinions regarding those impairments.  The summary below

focuses on related records that were identified and highlighted by the parties on appeal.

**A.      Personal, Educational, and Vocational Evidence**

Ms. McQuade was born in 1973.  (Tr. 29, 156.)  She last worked in December 2018 at

Anthem Blue Cross Blue Shield, having worked there for over twenty-two years as a sales

representative selling insurance plans.  (Tr. 41-42.)

**B.      Medical Evidence**

**1.       Treatment History**

Ms. McQuade's primary care physician during the relevant period was Kimberly Biglow,

M.D. with Southwest Family Physicians, Inc.  (Tr. 499, 537.)   Her treating rheumatologist was

Anabelle Morales-Mena, M.D., originally with Summa Health and later associated with Lake

Health Physicians Group.  (Tr. 499, 981.)

In April 2018, ANA and Rheumatoid Factor laboratory testing showed a positive ANA screen with an anti-nuclear AB titer of 1:160 with homogenous pattern, suggestive of autoimmune disease.  (Tr. 516.)  On May 2, 2018, SLE-Associated Analytes testing was positive. (Tr. 503.)   In July 2018, Ms. McQuade had Vectra DA testing performed, which is used "to aid in the assessment of disease activity in patients with rheumatoid arthritis (RA)" but is not "intended or validated to diagnose RA."  (Tr. 501.)   Ms. McQuade's Vectra DA score was 30, falling within the moderate range of activity level. (*Id.*)

On October 8, 2018, Ms. McQuade attended an endocrinology consult for hypothyroidism with Omar Zmeili, M.D. at Summa Health.  (Tr. 504-08.)   She was tearful and crying, and reported being under a lot of stress at work.  (Tr. 504.)  She reported her joint pain had improved initially with Plaquenil, but had worsened during the prior week.  (*Id.*)  She reported being diagnosed with hypothyroidism when she was thirty years old and being on thyroid replacement therapy (Synthroid) since her diagnosis.  (Tr. 504-05.)  She reported fatigue, diarrhea, heat intolerance, and difficulty losing weight, but also reported exercising five nights a week by going to the gym, walking, and lifting weights.  (*Id.*)  Physical examination findings were normal.  (Tr. 507.)  Her diagnoses included hypothyroidism due to Hashimoto's thyroiditis, presence of anti-TPO antibodies, obesity without serious comorbidity, and diarrhea, unspecified type.  (Tr. 507-08.)  Dr. Zmeili adjusted her Synthroid dosage.  (Tr. 508.)

Ms. McQuade returned to Dr. Morales-Mena on November 12, 2018 for a rheumatology follow up. (Tr. 444-46.)  She reported that Plaquenil had "been very helpful", but she was "currently not doing well due to major stress with her mother's health."  (Tr. 445.)   On examination, Ms. McQuade was anxious and crying but her physical examination findings were normal.  (Tr. 446.)  Her diagnoses included seronegative rheumatoid arthritis of multiple sites,

systemic lupus erythematosus (SLE) with other organ involvement, thyroid disease, canker sores, Vitamin D deficiency, and severe anxiety.  (*Id*.)

On December 19, 2018, Ms. McQuade returned to see Dr. Morales-Mena for follow up regarding SLE and seronegative RA.  (Tr. 441-44.)  She reported "feeling very fatigued" and having a headache for one month.  (Tr. 442.)  She also reported having a rash on her chest and face that lasted two days but had since resolved.  (*Id*.)  In addition, she reported having mouth ulcers, increasing joint pain in her feet and hands, and increasing stress over the prior weeks due to work and her mother's health.  (*Id*.)  Aside from musculoskeletal tenderness and evidence of a rash, physical examination findings were normal, including normal range of motion, muscle tone, strength, sensation, and gait.  (Tr. 443.)

On the same date, Ms. McQuade attended an endocrinology follow up with Sonia Vasil, APRN, CNS.  (Tr. 438-41.)  She reported diarrhea, but celiac testing was noted to be negative.  (Tr. 438.)  Ms. McQuade was tearful and crying, and reported stress and anxiety due to work and taking care of her mother.  (Tr. 438-39.)  She continued to report going to the gym five days a week for exercise, and had started meditating, but was taking a leave of absence from work.  (Tr. 438-39.)  Physical examination findings were normal.  (Tr. 440.)  Her Synthroid was continued, and she was instructed to follow up in three months.  (Tr. 441.)

On January 2, 2019, Ms. McQuade presented to the emergency room at Southwest General with complaints of nausea, vomiting, and diarrhea.  (Tr. 381.)  Treatment was provided by Kaleigh Benz, CNP.  (*Id*.)  Musculoskeletal and neurological examinations were normal.  (Tr. 383-84.)  Her lab work was "remarkable for slight hypokalemia with a potassium of 3.2" and she was administered an oral potassium replacement.  (Tr. 384.)  Her white blood cell counts were

normal and C. difficile was negative.  (*Id*.)  Ms. McQuade was diagnosed with viral

gastroenteritis with vomiting and diarrhea.  (Tr. 386.)

Ms. McQuade returned to Dr. Biglow on January 10, 2019, reporting anxiety and

depression, sore throat, ongoing issues with diarrhea, worsening of headaches, lupus flare, and

attention deficit disorder.  (Tr. 537.)  She was tearful throughout her appointment, reporting that

she had started Lexapro the month before but could not tell if it was helping because she had

been ill with various infections and at home in bed for six weeks.  (*Id*.)  On examination, Dr.

Biglow observed an erythematous chest rash that was bright red but nontender, congestion,

tongue lesions, and a sad appearance.  (Tr. 539.)  Ms. McQuade's gait and station were normal

and she was alert and oriented times three.  (*Id*.)  Dr. Biglow concluded she was having a lupus

flare up and noted that she was scheduled to see her rheumatologist the following week.  (Tr.

541.)  Dr. Biglow ordered a brain MRI to assess her chronic headaches and noted she was

scheduled to see a gastroenterologist regarding her diarrhea.  (*Id*.)  She continued Ms.

McQuade's prescriptions for Synthroid, Trazadone, Plaquenil, Adderall, Focalin, and

Sumatriptan.  (Tr. 540-41.)

On January 30, 2019, Ms. McQuade presented to Fiona Ju, APRN, CNP at Summa

Akron City Hospital for a consult regarding chronic diarrhea.  (Tr. 434.)  She reported chronic

diarrhea off and on for twenty years and estimated having diarrhea seven to nine times each day,

in addition to nocturia diarrhea.  (*Id*.)  CNP Ju reviewed results of an EGD and colonoscopy

from June 2016, which were normal.  (Tr. 435.)   On examination, CNP Ju observed moderate

tenderness to palpation above the lower abdomen area.  (Tr. 436.)  Ms. McQuade demonstrated a

full range of motion in the extremities and appeared comfortable, alert, and oriented and her

mood, affect, and thought content were normal. (*Id*.)  She was diagnosed with chronic diarrhea, lower abdominal pain, and GERD.  (Tr. 437.)  A colonoscopy and EGD were ordered.  (*Id*.)

The results of Ms. McQuade's brain MRI in January 2019 were compared to a prior study from March 2016, and showed no significant interval change.  (Tr. 304-05.)  The 2019 study showed nonspecific rare white matter changes, possibly related to small vessel ischemic change in a patient her age, but no evidence of acute ischemic change.  (Tr. 305.)

Ms. McQuade returned to Dr. Morales-Mena on February 12, 2019 for a follow up regarding lupus, arthritis, hand pain and stiffness, headaches, and joint pain.  (Tr. 431-32.)  On examination, she appeared distressed and demonstrated musculoskeletal edema, tenderness, and a rash, but had no abdominal tenderness.  (Tr. 433.)  Her range of motion, strength, sensation, muscle tone, gait, mood, affect, and behavior were normal.  (*Id*.)  She was diagnosed with seronegative rheumatoid arthritis of multiple sites, SLE with other organ involvement, thyroid disease (history of Hashimoto's), long-term Plaquenil use, and microscopic colitis, unspecified type.  (Tr. 433.)  Dr. Morales-Mena noted some improvement with Plaquenil but without remission.  (*Id*.)  She referred Ms. McQuade for a second gastroenterology opinion regarding her chronic diarrhea and history of microscopic colitis, and referred her to neurology for neuropathy and chronic headaches.  (*Id*.)

On February 25, 2019, Ms. McQuade saw Jason Vollweiler, M.D. at Westside Gastroenterologists, Inc. regarding her ongoing chronic diarrhea.  (Tr. 475-77, 499.)  She reported a prior endoscopy was normal, but also reported being diagnosed with microscopic colitis.  (Tr. 475.)  She complained of ten to twelve watery urgent stools daily, worse after eating. (*Id*.)  She also reported that she was on medical leave from her job because she could not eat during the day without having multiple stools.  (*Id*.)  She also reported nighttime incontinence

that had been more frequent in recent months.  (*Id*.)  Since gastric sleeve surgery in 2014, she also reported that she had a tendency to vomit if she ate too fast.  (*Id*.)  She stated that she tested negative for Giardia, cryptosporidium, stool culture, and C. difficile in January 2019, and had a normal CBC and CMP except for potassium 3.2.  (*Id*.)  Physical examination findings were normal.  (Tr. 476.)  Dr. Vollweiler was "suspicious that [Ms. McQuade's] current symptoms could be due to microscopic colitis."  (*Id*.)  He planned to review her prior records from Northshore Gastroenterology, and he ordered a colonoscopy.  (Tr. 476-77.)

On the same day, Ms. McQuade returned for a follow-up visit with Dr. Biglow regarding anxiety, insomnia, headaches, lupus, diarrhea, and stool incontinence.  (Tr. 548-52.)  She reported tolerating Plaquenil but experiencing ongoing uncontrolled lupus symptoms.  (Tr. 548.)  She continued to report life stressors, including taking care of her ill mother.  (*Id*.)  She was taking Lexapro, Lorazepam, and Adderall for her mental health conditions.  (*Id*.)  She reported a worsening of her migraines and that she was scheduled to see neurology.  (Tr. 549.)  She also reported feeling good about losing twenty pounds since August.  (*Id*.)  She said she was getting out and walking her daughter's dog on a regular basis, which she found to be therapeutic.  (*Id*.)  Examination findings were normal.  (Tr. 550.)

Ms. McQuade returned to see Dr. Zmeili on March 12, 2019 regarding her thyroid problems.  (Tr. 427-30.)  She continued to report fatigue, diarrhea, heat intolerance, decreased appetite, and anxiety.  (Tr. 427.)  She also continued to report going to the gym five nights per week, walking, and lifting weights.  (*Id*.)  Examination findings were normal.  (Tr. 429.)  Dr. Zmeili continued her on Synthroid and noted he would check her lab work and adjust her dose accordingly.  (Tr. 430.)

On March 13, 2019, Ms. McQuade saw Suresh Kumar, M.D. regarding her headaches. (Tr. 310-14.)  She reported a history of headaches since her teenage years.  (Tr. 312.)  She also reported chronic diarrhea, sometimes up to fifteen times a day, and nighttime bowel incontinence once per week.  (*Id*.)  She reported being diagnosed with lupus and rheumatoid disease about a year and a half earlier.  (*Id*.)  Examination findings were normal.  (Tr. 313.)  Dr. Kumar reviewed the diagnostic studies and noted that the recent 2019 brain MRI showed no significant changes since a 2016 MRI and no significant abnormalities.  (*Id*.)  She was diagnosed with multifactorial headache, including tension type, migraine, and stress-related headache.  (*Id*.)  Dr. Kumar felt that she might have underlying microangiopathy related to Lupus, and discussed different treatment options, including medication and vagal stimulation.  (*Id*.)

Ms. McQuade underwent a colonoscopy on March 14, 2019.  (Tr. 338-39.)  Biopsies taken during the procedure were consistent with microscopic colitis. (Tr. 338.)

On April 23, 2019, Ms. McQuade returned to see Dr. Morales-Mena. (Tr. 422-25.)  She reported that Dr. Vollweiler diagnosed microscopic colitis.  (Tr. 422.)  She also reported sun sensitivity with a rash, major fatigue, tendency to drop items, and numbness.  (*Id*.)  She indicated Meloxicam was helping with her joint pain, and stated Dr. Kumar recommended Emgality for her migraines.  (*Id*.)  She reported that she had tried Entocort, but stated it caused bad gas pains and headaches.  (*Id*.)  Apart from musculoskeletal tenderness, examination findings were normal. (Tr. 424.)  Dr. Morales-Mena recommended use of sunblock while outside and to continue treatment for her other conditions.  (*Id*.)

Ms. McQuade also saw Dr. Kumar briefly on the same date, reporting that her headaches still persisted and vagal stimulation did not work.  (Tr. 315-18.)  Dr. Kumar noted that he filled out paperwork for Emgality and instructed her to follow up in about three months.  (Tr. 317.)

Ms. McQuade returned to Westside Gastroenterologists on May 17, 2019 and saw Debra Calabrese, PA-C for follow regarding her chronic diarrhea and incontinence.  (Tr. 472-73.)  She complained of daily abdominal bloating and distention after eating, and reported a very limited diet due to her multiple symptoms.  (*Id.*)  A physical examination showed a soft, diffusely tender, nondistended abdomen with normoactive bowel sounds.  (Tr. 473.)  Other examination findings were normal, including no edema, normal gait, and no focal weakness or numbness.  (*Id.*)  Ms. McQuade reported having less diarrhea after she started taking Entocort following her March 2019 colonoscopy, but said it caused her to be very constipated and have severe gas.  (Tr. 472.)  She had tried reducing the dose, but still had problems and eventually stopped taking it.  (*Id.*)  PA Calabrese recommended that Ms. McQuade try a low dose of Imodium daily and IBgard.  (Tr. 474.)  She also recommended a CTE to evaluate for Crohn's disease and to evaluate Ms. McQuade's complaints of abdominal bloating and distention.  (Tr. 474.)

Ms. McQuade returned to Dr. Biglow on May 23, 2019 for follow up regarding her multiple concerns, including attention deficit disorder, refills of her insomnia medication, lupus flare, an oral sore, finger swelling and pain, plantar wart, headache, and follow up on colonoscopy of microscopic colitis diagnosis.  (Tr. 576.)   She reported very severe issues with her chronic diarrhea, stating she had up to twenty to twenty-five watery stools every day.  (*Id.*)  Except for diffuse swelling of two fingers on her right hand with some joint tenderness and a plantar wart on the left foot, examination findings were normal. (Tr. 578-79.)

On June 4, 2019, Ms. McQuade underwent a CT Enterography at Southwest General, which showed:

> Somewhat featureless and diffusely fluid-filled colon with ascending and transverse wall edema are compatible with colitis. No small bowel involvement is identified. Specifically, the terminal ileum and appendix are unremarkable. There is no lymphadenopathy, pneumoperitoneum or abscess.

(Tr. 336-37.)  Her thyroid was reported to be normal on June 24, 2019, and Dr. Zmeili instructed her to continue with her same dose of thyroid replacement therapy.  (Tr. 420.)

Ms. McQuade returned to Dr. Biglow on July 29, 2019 for follow up, reporting that her stress levels remained high, and she continued to suffer from fatigue, myalgia, rashes, toe pain, memory concerns, migraines, and sensitivity to sun.  (Tr. 584.)   She was continuing to take Lexapro, Lorazepam, Adderall, Focalin, and Trazadone for mental health related conditions.  (*Id*.)  She reported tolerating Plaquenil.  (*Id*.)  She also reported improvement in her headaches, but was not sure if the improvement was related to the initiation of Emgality or recent Botox injections.  (Tr. 585.)  Examination findings were normal.  (Tr. 585-86.)

Ms. McQuade returned to see Dr. Vollweiler on August 9, 2019 for follow up regarding diarrhea and reported bouts of dizziness for three weeks.  (Tr. 481-82.)  She reported trying IBgard, but said it did not help her diarrhea or abdominal discomfort.  (Tr. 481.)  She had not tried Imodium.  (*Id*.)  Dr. Vollweiler noted that Ms. McQuade's CT Enterography "suggested possible mild colitis but was otherwise normal" and lab work from her primary care physician showed mild iron deficiency but she was not anemic.  (*Id*.)  Examination findings were normal.  (Tr. 482.)  Dr. Vollweiler recommended that she try an 8-week course of Pepto-Bismol to treat her microscopic colitis and diarrhea.  (*Id*.)  He also noted possible future treatment for bloating and iron deficiency but planned to monitor those conditions.  (Tr. 483.)

On August 29, 2019, Ms. McQuade returned to Dr. Morales-Mena for follow up regarding seronegative RA, multiple sites, lupus, and extreme fatigue.  (Tr. 593-600.)  She reported being approved for long-term disability, experiencing vertigo, starting Pepto-Bismol, feeling exhausted, having her hair fall out, feeling improvement from Botox (cosmetic) so that she discontinued Emgality, having a change made to her thyroid medication dose, and having

joint pain, swelling, stiffness, and sun sensitivity.  (Tr. 594.)  Except for musculoskeletal

tenderness, examination findings were normal.  (Tr. 596-97.)

Ms. McQuade returned to Dr. Zmeili on September 12, 2019 for her hypothyroidism.

(Tr. 415-19.)  Dr. Zmeili noted that her thyroid hormone replacement therapy dose had decreased

since early August 2019.  (Tr. 416.)  Examination findings were normal.  (Tr. 418.)

Ms. McQuade returned to Dr. Vollweiler on September 19, 2019.  (Tr. 484-86.)

Although she reported some improvement in her stool consistency when taking Pepto-Bismol,

she reported that she stopped taking it after ten days because of worsening gas discomfort.  (Tr.

484.)  She also reported new symptoms, including an occasional sensation that her throat was

closing and a feeling that she could not breathe with an associated burning sensation in her chest.

(*Id*.)  Examination findings were normal.  (Tr. 485.)  Since Ms. McQuade had not responded

well to Entocort or Pepto-Bismol, and given her prominent bloating, Dr. Vollweiler noted that

there might be small intestinal bacterial overgrowth and recommended a course of Xifaxan for

her diarrhea with follow up in four weeks.  (*Id*.)

On October 7, 2019, Ms. McQuade saw Hillary Greer, DPM at NOMS Southwest Foot

and Ankle for a lesion on her toe and complaints of bilateral foot pain and separation of her toes.

(Tr. 615.)  On examination, Dr. Greer noted spreading of the 2nd and 3rd toes on both feet and

felt a palpable bursal sac in the second interspace bilaterally which caused mild discomfort on

palpation bilaterally.  (Tr. 616.)  Ms. McQuade was diagnosed with bilateral bursitis of her

second interspace, which Dr. Greer explained was likely due to rheumatoid arthritis.  (*Id*.)  Ms.

McQuade received a steroid injection for the pain.  (*Id*.)

On October 2, 2019, Dr. Biglow referred Ms. McQuade for neuropsychological testing

conducted by Amir M. Poreh, Ph.D., a clinical neuropsychologist at Neuro Process, LLC, to

assess for possible unspecified cognitive decline with behavioral disturbances.  (Tr. 672-76.)  Dr. Poreh observed that it was "apparent that [Ms. McQuade] [was] experiencing various severe physical symptoms" which "reflect[ed] physical/medical problems, yet [were] likely exacerbated by emotional distress."  (Tr. 675.)  He indicated that Ms. McQuade "exhibit[ed] [] largely intact cognitive functioning and her subjective report of memory problems [was] likely due to a combination of normal aging and fear of developing dementia given her medical condition" and "observing her mother's cognitive decline due to dementia."  (Tr. 675-66.)  Dr. Poreh made a note to rule out the following diagnostic possibilities: anxiety disorder, unspecified and unspecified mental disorder due to known physiological condition (lupus).  (Tr. 676.)

When Ms. McQuade returned to Dr. Kumar on October 17, 2019, she reported having Botox injections three months earlier for cosmetic reasons, and said the injections relieved her headaches for ninety days.  (Tr. 302.)  She reported however that her headache was returning, and a second round of Botox injections had not helped as much.  (*Id*.)  Ms. McQuade was diagnosed with "headache-migraine, tension type headache-mixed headache."  (*Id*.)  Dr. Kumar prescribed Florinal and provided her with the names of providers who used Botox in their practice for treatment of migraines.  (Tr. 303.)

On October 21, 2019, Ms. McQuade returned to Dr. Biglow for follow up.  (Tr. 619-23.)  Dr. Biglow noted Dr. Poreh had recommended counseling and repeat neurocognitive testing in a year or two in light of the lupus diagnosis.  (Tr. 619.)  Ms. McQuade reported that she planned to pursue counseling as recommended.  (*Id*.)  She also reported that gastroenterology recommended Xifaxan, but rheumatology said she could not take it while on Plaquenil.  (*Id*.)  Because her lupus was under better control, she was going to hold off on taking Xifaxan despite continued severe issues with diarrhea.  (*Id*.)  Her examination showed tenderness and diffuse soft tissue swelling

in the hands bilaterally, non-patchy hair loss, and erythema over the cheeks and bridge of the nose.  (Tr. 621.)  Otherwise, examination findings were normal.  (*Id*.)

Ms. McQuade returned to Dr. Greer on October 30, 2019, reporting some improvement in her left foot, significant improvement in her right foot, and that her toes were no longer spreading.  (Tr. 657-59.)   She declined another injection due to her improvement.  (Tr. 658.)

On November 12, 2019, Ms. McQuade saw Ahmed Ghany, M.D. at Southwest General for evaluation and management of iron deficiency and anemia.  (Tr. 625.)  She reported a prior history of iron infusions following her gastric sleeve surgery.  (*Id*.)   Physical examination findings were normal.  (Tr. 626.)  Two infusions were planned and administered on November 26, 2019 and December 3, 2019, with recommended follow up and lab work in six months and a year.  (Tr. 636, 644, 645.)

Ms. McQuade returned to Dr. Greer on December 9, 2019, reporting some lingering discomfort associated with her bursitis, but declined any additional injections due to her other health conditions.  (Tr. 660.)

When Ms. McQuade saw Dr. Biglow on January 16, 2020 for follow up, she reported: she had received an iron infusion and was scheduled for follow up; she might need a sleep evaluation because of sleep disturbances; she did not think Focalin was working and was having a hard time concentrating; she discontinued Lexapro on her own because she did not feel it was helping, but her anxiety levels had been very high; she was having chronic pain, fatigue, and rashes due to her autoimmune disorder; her diarrhea was severe and she was planning to start Xifaxan; and she was receiving Botox treatments for her migraines.  (Tr. 691-92.)  On examination, Ms. McQuade had mild congestion and erythema across her cheeks and nose.  (Tr. 693-94.)  Otherwise, examination findings were normal, including normal gait and station.  (*Id*.)

Ms. McQuade returned to Westside Gastroenterologists on March 9, 2020 for follow up. (Tr. 951-54.)  She saw PA Calabrese and reported that she could not take Xifaxan with her Plaquenil.  (Tr. 951.)  She complained of frequent watery bowel movements during the day and a few instances of early morning incontinence while sleeping.  (*Id*.)  She also continued to report bloating and abdominal distention, and complained of "overwhelming" fatigue, migraines, and joint pain.  (*Id*.)  Examination findings were normal.  (Tr. 952.)  PA Calabrese noted that Ms. McQuade was taking Gas-X for her gas pain and bloating, and recommended dicyclomine because Ms. McQuade reported not being able to take Xifaxan.  (*Id*.)

In March 2020, Ms. McQuade informed Dr. Biglow's office that she had not been able to follow up on scheduling a sleep study or getting lab work because she had been caring for her mother, who was not doing well.  (Tr. 672, 675.)  On March 24, 2020, Dr. Biglow informed Ms. McQuade that her lab results showed that her "thyroid [was] on goal." (Tr. 761.)

On April 1, 2020, Ms. McQuade had a telephone visit with Dr. Morales-Mena.  (Tr. 981-82.)  She had not followed up for a while because her mother was very sick and she was taking care of her at home.  (Tr. 981.)  She reported increased exhaustion, bursitis of the toes, sore hands, alopecia, pain and stiffness even though Plaquenil still working, mucosal sores, fatigue that made her feel like she could sleep for a month, and out of control colitis.  (Tr. 981.)  Dr. Morales-Mena started her on folic acid for her SLE and Sulfasalazine for her RA.  (Tr. 982.)

Ms. McQuade saw Dr. Biglow on April 9, 2020 for an acute tele-health visit, reporting ongoing severe diarrhea with no relief from the dicyclomine that Dr. Vollweiler's office had prescribed.  (Tr. 732.)  Though Dr. Morales-Mena had recommended that she start Sulfasalazine for her RA and to see if it would help with her diarrhea, Ms. McQuade reported that she had not

started it yet because she had a severe headache and did not want to start a new medication while having head pain. (*Id*.)

Ms. McQuade had a telephone gastroenterology visit with PA Calabrese on June 8, 2020. (Tr. 955.)  She reported five to twelve bowel movements per day, described as watery and urgent with a few instances of morning incontinence while sleeping, abdominal distention, overwhelming fatigue, migraines, and joint pain.  (*Id*.)  PA Calabrese noted that Ms. McQuade could consider Sulfasalazine as recommend by Dr. Morales-Mena if C. difficile was ruled out. (Tr. 956.)

Ms. McQuade returned to Dr. Morales-Mena on July 6, 2020, reporting that she had a flare up and had to take Prednisone, but that it made her eat everything in sight and gain weight. (Tr. 984.)   She reported trying Sulfasalazine, and said it helped her have more formed stools but caused major gas pains, hemorrhoids, and dehydration.  (*Id*.)  She stopped taking it, and had major diarrhea within a couple of days.  (*Id*.)   She said Dr. Zmeili told her her thyroid had been stable for nine months so she did not have to test.  (*Id*.)  She complained that her hands were still a problem and she was dropping things.  (*Id*.)  She also reported that her feet were hurting.  (*Id*.) On examination, she demonstrated moderate to severe tenderness of the fingers, wrists, shoulders, knees, and feet, a left tender popliteal cyst, tenderness to palpation of the spine, swelling throughout her joints, and was anxious and teary. (Tr. 985-86.)  She demonstrated an adequate gait without an assistive device.  (Tr. 986.)

Ms. McQuade returned to Dr. Biglow again on July 14, 2020, reporting left foot pain, a diagnosis of Baker's cyst by her rheumatologist, ongoing issues with oral ulcers, fatigue, headaches, and chronic diarrhea that she reported was significantly impacting her life.  (Tr. 813-

14.)   Except for noted tenderness of the left foot between the 2nd and 3rd metatarsal heads, examination findings were normal, including normal gait and station.  (Tr. 815.)

Ms. McQuade returned to Dr. Kumar on September 24, 2020, reporting that she had been doing "fairly well and responding to Botox" but had persistent head pressure for the last five weeks.  (Tr. 842.)  She also reported blurry vision without blindness or double vision.  (*Id*.)  She reported no recent significant migraines, and indicated that she was using Fioricet as needed when she had them.  (*Id*.)  Dr. Kumar recommended that she see an ophthalmologist and follow up with her rheumatologist regarding the ability of taking Emgality while taking Benlysta.  (Tr. 843-44.)  He also recommended that she let Dr. Biglow know that her blood pressure was 150/100 when taken that day in the office.  (Tr. 844.)

On October 5, 2020, Ms. McQuade returned to Dr. Biglow for follow up.  (Tr. 971-75.)  During that visit, she reported that she recently had to cancel a rheumatology appointment because her diarrhea was so bad that she could not leave her home.  (Tr. 972.)  She also reported an increase in headaches since starting Benlysta for management of her lupus.  (Tr. 971.)  She complained of ongoing severe left foot pain, and was planning to return to Dr. Greer for a second bursitis injection.  (Tr. 972.)  On examination, she demonstrated tenderness in the left foot.  (Tr. 973.)  Otherwise, examination findings were generally unremarkable.  (*Id*.)

Ms. McQuade saw Dr. Morales-Mena on October 20, 2020 for a follow up.  (Tr. 991-94.)  She rated her headache, foot, and knee pain as an eight out of ten.  (Tr. 993.)  Except for the notation of height, weight, and vital signs, no objective findings were noted.  (*Id*.)

2.      **Opinion Evidence**

i.      **Treating Physician Opinion**

On October 27, 2020, a "Medical Source Statement: Patient's Physical Capacity" form was completed. (Tr. 1003-04.) There is a signature on the form, but the signatory's name is not printed on the form. (Tr. 1004.) When discussing the opinion, the ALJ stated: "As an initial matter, the signature on the form is not clear as to the provider filling out the form, though it could be the signature of Kimberly Biglow, M.D., but it is not clear." (Tr. 27.) Ms. McQuade asserts this opinion was completed by her primary care physician Dr. Biglow, noting similarities between the signature on the opinion and other signatures in the record associated with Dr. Biglow's typed name. (ECF Doc. 11 p. 15 (citing Tr. 817, 975).) The undersigned also notes that the exhibit containing the opinion (Exhibit 29F) is indexed in the certified record submitted by the Commissioner as "Physical, dated 10/27/2020, from Kimberly Biglow, M.D" (ECF Doc. 9 p. 5) and it is listed as "Medical Opinion – Physical Kimberly Biglow, M.D. 2020-10-27" in the List of Exhibits attached to the ALJ's decision (Tr. 37). Considering these references and the ALJ's acknowledgement that the signature on the opinion form could be that of Dr. Biglow, the undersigned will consider the October 27, 2020 opinion as authored by Dr. Biglow when reviewing the evidence and claims raised herein.

In the October 2020 Medical Source Statement, Dr. Biglow opined that Ms. McQuade had the following limitations:

- lift and/or carry four to five pounds occasionally and two to three pounds frequently, supported by the following medical findings:[1] numbness in fingers and toes which causes patient to drop things; stiff joints and joint swelling; lupus, RA, and Raynaud's;

- stand and/or walk for a total of one to two hours, supported by the following medical findings: bursitis in feet, Baker's cyst in left knee, and numbness in feet;

---
[1] Certain medical findings listed as support for the assessment are not fully legible.

- sit for a total of one to two hours and sit without interruption for one to two hours and up repeatedly to use the bathroom, supported by the following medical findings: "main issue . . . is patient has 8-10 bowel movements a day due to microscopic colitis" and "has chronic migraines that affects prolonged sitting";

- never kneel and crawl; rarely climb and crouch; and occasionally balance and stoop, supported by the following medical findings: RA, bursitis in feet, lupus, Raynaud's, and Baker's cyst;

- occasionally reach, push/pull, and perform fine or gross manipulation, supported by findings identified in response to prior assessments;

- restrictions in exposure to height, moving machinery, temperature extremes, pulmonary irritants, and noise, supported by the following medical findings: anxiety, migraine headaches, and lupus.

(Tr. 1003-04.)  She reported Ms. McQuade had been prescribed a knee brace.  (Tr. 1004.)  She opined that Ms. McQuade would need to alternate between sitting, standing, and walking at will, and that she experienced moderate / severe pain that would interfere with concentration, take her off task, and cause absenteeism.  (*Id*.)  Dr. Biglow also opined that Ms. McQuade would require additional unscheduled breaks beyond two standard fifteen-minute breaks and a thirty-minute lunch break because she needed to use the bathroom frequently due to microscopic colitis.  (*Id*.)

###     ii.     Treating Rheumatologist Opinion

On November 2, 2020, Ms. McQuade's treating rheumatologist Dr. Morales-Mena completed a "Medical Source Statement: Patient's Physical Capacity."  (Tr. 1014-15.)  Dr. Morales-Mena opined that Ms. McQuade had the following limitations:

- lift and/or carry four to five pounds occasionally and two to three pounds frequently, supported by the following medical findings: arthritis in her hands, numbness in her fingers and toes, Raynaud's, difficulty with grip and dropping things, and difficulty bending due to pain and myalgias;

- stand and/or walk for less than twenty to thirty minutes at a time, supported by the following medical findings: inflammatory arthritis, bursitis, and Baker's cyst;

- sit for less than twenty to thirty minutes at a time, supported by the following medical findings: pain and stiffness, colitis / chronic diarrhea (ten to fifteen bowel movements per day), microscopic colitis per biopsy, and CT scan;

- never crouch, kneel, or crawl, and rarely climb, balance, or stoop, supported by the following medical findings: joint pain, stiffness, difficulty with mobility, migraines, and extreme fatigue;

- occasionally reach, push/pull, and perform fine or gross manipulation, supported by the same findings identified in support of the lifting and/or carrying limitations;

- restrictions in exposure to height, moving machinery, temperature extremes, pulmonary irritants, and noise, supported by the previously noted medical findings and due to multiple sensitivities and triggers for pain and migraine headaches.

(*Id.*)  Dr. Morales-Mena reported Ms. McQuade had been prescribed a knee brace.  (Tr. 1015.) She opined that Ms. McQuade would need to alternate between sitting, standing, and walking at will, and that she experienced severe pain that would interfere with concentration, take her off task, and cause absenteeism.  (*Id.*)  Dr. Morales-Mena also opined that Ms. McQuade would require additional unscheduled breaks beyond two standard fifteen-minute breaks and a thirty-minute lunch break.  (*Id.*)

### iii.    State Agency Reviewing Medical Consultants

On initial review, on November 11, 2019, state agency reviewing medical consultant Steven McKee, M.D. opined that Ms. McQuade had the physical RFC to:

- lift and/or carry twenty pounds occasionally and ten pounds frequently;

- stand and/or walk about six hours in an eight-hour day;

- sit about six hours in an eight-hour day;

- never climb ladders, ropes, or scaffolds;

- occasionally climb stairs / ramps, balance, stoop, kneel, crouch, or crawl; and

- avoid all exposure to hazards, including unprotected heights and hazardous
  machinery.

(Tr. 65-66.)  At the reconsideration level, on March 30, 2020, state agency reviewing medical

consultant Abraham Mikalov, M.D. concluded that "review of evidence support[ed] the initial

findings."  (Tr. 73-75.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the November 12, 2020 hearing, Ms. McQuade testified in response to questioning by

the ALJ and her counsel.  (Tr. 41-54.)   She testified that she stopped working in December 2018

due to various health issues, including a lupus flare, migraines, and out of control colitis.  (Tr.

41-42.)  She explained that her hands were swollen and hard to bend and she had a rash on her

face in early 2018.  (Tr. 42-43.)  Dr. Biglow ordered testing and referred her to a rheumatologist,

who diagnosed her with lupus in July 2018.  (*Id*.)

Ms. McQuade also testified to being "paralyzed in the bathroom" due to her colitis,

which caused chronic diarrhea.  (Tr. 43.)  She reported having ten to fifteen bowel movements

throughout the day and evening.  (Tr. 43-44.)  She also reported instances of nocturnal

incontinence and accidents when she was away from home without a bathroom.  (Tr. 44.)  She

reported trying multiple medications with minimal relief and side effects that included abdominal

pain and excessive gas.  (*Id*.)

Ms. McQuade reported that she typically had a migraine or headache twenty days out of

the month, and had been having them with that frequency for about two years.  (Tr. 44-46.)   She

stated that Emgality had not helped, and Botox helped initially but had not helped more recently.

(Tr. 45-46.)  She described her headaches as dull at times and sometimes so bad that she could not focus and had to lie down.  (Tr. 45.)  She also stated that they lasted for days.  (*Id.*)

She also testified to having uncontrolled thyroid problems and rheumatoid arthritis ("RA").  (Tr. 45, 46.)  Her rheumatologist had explained to her that having lupus and RA was "like a double whammy and they kind of mimic each other."  (Tr. 46.)  She reported always being tired and extremely fatigued and having muscle stiffness.  (*Id.*)  She also reported that she had developed Raynaud's, which caused numbness in her fingers and toes and made them turn blue.  (Tr. 46-48.)  She also had bursitis in her feet which made it hard for her to walk, and a Baker's cyst behind her left knee.  (Tr. 46-47.)  She testified that she was constantly dropping things because she had no feeling in her fingers.  (Tr. 47-48.)

Ms. McQuade testified that she suffered from mental health problems, including attention-deficit disorder, anxiety, and depression, and felt that there was "some inter-relation . . . between [her] physical conditions and [her] mental conditions."  (Tr. 47-48.)  She explained that her anxiety caused her "brain fog," and that her inability to work after working for so many years caused her to be depressed.  (Tr. 48.)  She reported taking Adderall and Lorazepam for her mental health, in addition to seeing a counselor and meditating.  (Tr. 47-48.)

Ms. McQuade had lived with her mother for ten years.  (Tr. 49.)  She explained that her mother had health issues of her own, but could physically take care of herself.  (*Id.*)  Ms. McQuade reported that she did not shower every day because she was tired, needed help making food, and had difficulty getting herself dressed.  (Tr. 49-50.)  She was able to perform some light household chores, like tidying up, washing dishes, or sweeping the floor, but explained that washing dishes was difficult because she lacked feeling in her fingers.  (Tr. 50.)  She hired someone to do yardwork because she was unable to be outside.  (Tr. 51.)  She had to cover up if

21

she was outside, which was hard to do when it was warm.  (*Id*.)  If she was not in the bathroom or at medical appointments, she reported that she slept a lot, tried to stay off her feet, meditated, and was learning how to manage all her medical conditions.  (Tr. 53.)

Ms. McQuade testified that she could go grocery shopping, run errands, or attend doctor appointments, but she had to plan for it by not eating because of her colitis.  (Tr. 51.)  She stated: "I have high blood pressure because I'm nervous when I get to the doctor because I have to go to the bathroom, you know, trying to -- not being able to go to the bathroom, you know, that's my biggest situation right now."  (Tr. 52.)  She explained that the mornings were the worst for her because she had to run to the bathroom after eating breakfast.  (*Id*.)  She stated: "[A]fter I eat my breakfast and I've gone to the bathroom five times, then it will subside a lit[tle] and then I'm able to, you know, get dressed and -- and do -- if I have to go and do anything, go to the doctors, but I have to come right back home."  (*Id*.)  She further explained that she would start to get shaky and dizzy when she was out too long because she was not able to eat.  (Tr. 53.)  She reported she would have to return home to eat something, but then would be back in the bathroom. (*Id*.)  She said: "[e]verything I have, like it goes right through me."  (*Id*.)

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 54-57.)  The VE classified Ms. McQuade's past sales representative work as a light exertional, skilled position, and explained it could be classified as a medium exertional, skilled position as performed by Ms. McQuade.  (Tr. 54.)  The ALJ asked the VE whether Ms. McQuade's past work or any other jobs would be available for an individual of the same age and with the same education and vocational background as Ms. McQuade who was limited to light exertional work with additional non-exertional limitations of:

> no climbing of ladders, ropes or scaffolds or crawling, occasional climbing of ramps and stairs, balancing, stooping, kneeling or crouching; up to frequent handing and fingering; no concentrated exposure to vibration or high background noise, no exposure to hazards such as heights, machinery, commercial driving and must have ready access to restroom facilities so no work outdoors.

(Tr. 55.)  The VE testified that the described individual would be capable of performing Ms. McQuade's past work as a sales representative as customarily performed but not as performed by Ms. McQuade.  (*Id*.)  The VE also testified that there would be other jobs that the described individual could perform, including checker, routing clerk, document preparer, and callout operator.  (Tr. 55-56.)

The VE testified that there would be no work available if the described individual was also off-task at least twenty percent of the time.  (Tr. 56.)  For an individual to maintain competitive employment, the VE testified she should not be absent more than two days per month.  (Tr. 56-57.)  If the individual would need approximately four unscheduled breaks each day in addition to normally allowed breaks, the VE stated the individual would not be able to maintain competitive employment.  (Tr. 57.)  The VE also testified that an individual would be unable to perform Ms. McQuade's past work or work at light or sedentary exertional levels if the fingering and handling limitations in the ALJ's first hypothetical were reduced and the individual was limited to occasional contact with supervisors, coworkers, and the general public.  (*Id*.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520,  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

24

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his December 1, 2020 decision, the ALJ made the following findings:[2]

1. The claimant meets the insured status requirements through December 31, 2023. (Tr. 17.)

2. The claimant has not engaged in substantial gainful activity since December 17, 2018, the alleged onset date.  (*Id.*)

3. The claimant has the following severe impairments: systemic lupus erythematosus, seronegative rheumatoid enthesopathy, migraine, Hashimoto thyroiditis, irritable bowel syndrome with microscopic colitis, bursitis of feet, Raynaud's phenomenon, and mild obesity.  (Tr. 17-20.)

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 20-21.)

5. The claimant has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except for no climbing of ladders, ropes or scaffolds, or crawling; occasional climbing of ramps and stairs, balancing, stooping, kneeling and crouching; frequent handling and fingering; no concentrated exposure to vibration or high background noise; no exposure to hazards (heights, machinery, commercial driving); and she must have ready access to restroom facilities, so no work outdoors. The claimant does not have severe mental limitations.  (Tr. 21-28.)

6. The claimant is capable of performing her past relevant work as a sales representative. (Tr. 28-29.)

7. Additionally, there are other jobs that exist in significant numbers in the national economy that claimant can perform considering her age, education, work experience, and RFC, including checker, routing clerk, document preparer, and call-out operator.  (Tr. 29-31.)

Based on the foregoing, the ALJ determined that Ms. McQuade had not been under a disability from December 17, 2018 through the date of the decision.  (Tr. 31.)

---

[2] The ALJ's findings are summarized.

## V. Plaintiff's Arguments

Ms. McQuade presents two assignments of error.  First, she argues the ALJ failed to properly assess the medical opinion evidence, including opinions rendered by treating physician Dr. Biglow and treating rheumatologist Dr. Morales-Mena.  (ECF Doc. 11 pp. 14-18.)  Second, she argues that the ALJ erred by not including additional unscheduled breaks, off-task behavior, and absenteeism in the RFC limitations.  (*Id*. at pp. 19-21.)

## VI. Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if a preponderance of evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007), citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004)).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: Whether ALJ Erred in Evaluating Medical Opinions**

In her first assignment of error, Ms. McQuade challenges the ALJ's evaluation of medical opinion evidence, specifically the opinions of treating physician Dr. Biglow and treating

rheumatologist Dr. Morales-Mena.  (ECF Doc. 11 pp. 14-18 (citing Tr. 26-28).)  The ALJ found

both opinions were not persuasive.  (Tr. 27 (citing Tr. 1003-04, 1014-15).)  Ms. McQuade

contends the ALJ erred in finding the opinions not persuasive because he "selectively parsed and

cherry picked the record, ignoring the objective evidence in support of these opinions and [Ms.

McQuade]'s consistent subjective reports."  (ECF Doc. 11 p. 14.)  Further, Mr. McQuade asserts

the ALJ "disregard[ed] the opinions of both" providers "in favor of the opinions of the state

agency's non-treating, non-examining physicians."  (*Id*.)  The Commissioner responds that the

ALJ reasonably considered and evaluated the medical opinion evidence.  (ECF Doc. 12 pp. 11-

15.)

       The Social Security Administration's ("SSA") regulations governing the evaluation of

medical opinions provide that "administrative law judges will now evaluate the 'persuasiveness'

of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the

regulation."  *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D.

Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020)

(citing 20 C.F.R. § 404.1520c(a) and (b)).  The five factors are supportability, consistency,

relationship with the claimant, specialization, and other factors, with supportability and

consistency acknowledged to be the most important factors for consideration.  20 C.F.R. §

404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2).  While ALJs are required to explain how

consistency and supportability were considered, they "may, but are not required to, explain how

[they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate,

when [they] articulate how [they] consider medical opinions and prior administrative medical

findings in [a claimant's] case record."  20 C.F.R. § 404.1520c(b)(2).

The regulations define "supportability" as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  The regulations define "consistency" as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

### 1.    Whether ALJ Erred in Finding Opinions of Non-Examining State Agency Medical Consultants More Persuasive Than Opinions of Treating Physicians

Ms. McQuade first argues that the ALJ's evaluation of the medical opinion evidence is not supported by substantial evidence because the ALJ found the November 2019 and March 2020 opinions of "the state agency's non-treating, non-examining physicians" Dr. McKee and Dr. Mikalov to be more persuasive than Ms. McQuade's own treating physicians.  (ECF Doc. 11 p. 14 (citing Tr. 26-28).)  She notes that the most recent state agency medical consultant opinion is from March 2020, over eight months before the ALJ decision was issued in December 2020, and prior to the submission of the evidence marked as Exhibits 14F through 30F.  (*Id*. at n. 2.)

It was well-established under the prior regulatory standard that medical opinions must be supported by evidence, but need not be based on the complete evidentiary record.  *See Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011).  Where significant weight was given to a source who had not reviewed the entire record, the Sixth Circuit advised the ALJ should "give 'some indication' that he 'at least considered' that the source did not review the entire record." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016); *see also Blakley*, 581 F.3d at 409 (indicating there must be "some indication that the ALJ at least

29

considered" later medical records when greater weight was given to "an opinion that is not

'based on a review of a complete case record'") (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585

(6th Cir. 2007)). While this caselaw is not strictly applicable under new regulatory standards, the

concepts are nevertheless appropriately considered here. *See e.g.*, *Book v. Comm'r of Soc. Sec.*,

No. 2:20-CV-13027, 2022 WL 1212146, at *1, 8 (E.D. Mich. Apr. 25, 2022) (applying the

caselaw under new regulatory standard); *Michelle A. v. Comm'r of Soc. Sec.*, No. 1:20-CV-700,

2022 WL 908859, at *1, 7–10 (S.D. Ohio Mar. 29, 2022) (same).

       While the state agency medical consultants' review was not based on the entirety of the

record, their review was based on the medical evidence available at that time, which included

reports of significant postprandial diarrhea and paralyzing severe diarrhea, reports of exhaustion

and sleeping twelve to fourteen hours each day, diagnostic evidence suggestive of microscopic

colitis, reports of migraines, evidence of diffuse swelling in the hands and joint tenderness,

evidence of lupus exacerbation, evidence regarding medication used to treat headaches, and

evidence regarding iron infusions. (Tr. 62, 70-71, 73.) The ALJ ultimately found the medical

consultants' "opinions to be persuasive, as they [were] informed by program knowledge and

[were] generally supported by the medical records," but explicitly "<u>included additional</u>

<u>limitations to account for subsequent treatment records and the claimant's reports and increased</u>

<u>symptoms</u> from her severe impairments including migraines, systemic lupus erythematosus,

seronegative rheumatoid enthesoapthy, and irritable bowel syndrome with microscopic colitis."

(Tr. 26.) Specifically, he concluded that "the subsequent evidence is consistent with limitations

that the claimant have no concentrated exposure to vibration or high background noise; is limited

to frequent handling and fingering; and must have ready access to restroom facilities, so no work

outdoors." (*Id.*)

Because the ALJ recognized that the state agency medical consultants' opinions were not based on the entirety of the record and explicitly considered the impact of the records post-dating those opinions, the undersigned finds no merit to the argument that the ALJ's evaluation of the opinion evidence is not supported by substantial evidence because he found the opinions of the state agency medical consultants to be persuasive.

### 2.      Whether ALJ Erred in Evaluating Treating Physician Biglow's Opinion

Ms. McQuade challenges two elements of the ALJ's analysis regarding the October 2020 Medical Source Statement ascribed to Dr. Biglow.  (Tr. 1003-04.)  First, she contends the ALJ erred in noting it was "not clear" whether the document was signed by Dr. Biglow.  (*Id*. at p. 15 (citing Tr. 27).)  Next, she challenges the ALJ's finding that the opinion was not persuasive because "the objective testing and physical exams do not support the level of limitation contained in the[] opinion[]."  (*Id*.)  She contends this argument was inadequate because "[t]he ALJ fail[ed] … to give a specific citation to any evidence that might support this position, and he also neglect[ed] to reference objective evidence in the record which support[ed] Dr. Biglow's opinions and assigned limitations."  (*Id*. at 15-16.)  These arguments are addressed in turn below.

### i.      Whether ALJ Erred in Noting Uncertainty Regarding Signature

In assessing the persuasiveness of the October 2020 opinion, the ALJ first noted that the identity of the provider who completed and signed the form was "not clear," but that "it could be the signature of Kimberly Biglow, M.D."  (Tr. 27 (citing Tr. 1003-04).)  While Ms. McQuade does not contend that the opinion clearly identifies Dr. Biglow as its author, she does argue that "[a] basic comparison of the signature on the RFC to the other signatures of Dr. Biglow (where her name is type-written as well) shows that this is her signature."  (ECF Doc. 11 p. 15 (citing Tr. 817, 975).)

It is clear from a review of the opinion that the ALJ was correct in noting that the name of the provider who completed the form was not written anywhere legibly on the form.  (Tr. 1003-04.)  Nevertheless, Ms. McQuade has identified other signatures within the medical records that support a finding that Dr. Biglow was the signatory.  (Tr. 817, 975.)  Additional information supporting a conclusion that Dr. Biglow was the signatory includes the indexing of the relevant exhibit as "Physical, dated 10/27/2020, from Kimberly Biglow, M.D" in the certified record submitted by the Commissioner (ECF Doc. 9 PageID # 46) and the listing of the exhibit as "Medical Opinion – Physical Kimberly Biglow, M.D. 2020-10-27" in the list of exhibits attached to the ALJ's decision (Tr. 37).  While this information supports a finding that Dr. Biglow was the signatory, the ALJ was correct in observing that the identity of the signatory was "not clear" from the opinion.  Moreover, while the ALJ noted the lack of clarity regarding the identity of the medical source, he acknowledged that the signatory "could be" Dr. Biglow and proceeded to a substantive analysis in support of his finding that the opinion was "not persuasive."  (Tr. 27.)

Because the lack of clarity noted by the ALJ was supported by substantial evidence, and because the ALJ nevertheless proceeded to a substantive analysis of the opinion, the undersigned finds Ms. McQuade has not met her burden to demonstrate that it was reversible error for the ALJ to observe that the identity of the signatory to the opinion was "not clear."

### ii.    Whether ALJ Erred in Finding Opinion "Not Persuasive"

In further support of her request for remand, Ms. McQuade challenges the ALJ's conclusion that Dr. Biglow's opinion was not persuasive because, "[w]hile the records support some level of limitation" in the specified areas, "the objective testing and physical exams do not support the level of limitation contained in the[] opinion[]."  (ECF Doc. 11 p. 15 (citing Tr. 27).)  She argues that the ALJ "fail[ed] … to give a specific citation to any evidence that might support

32

this position, and also neglect[ed] to reference objective evidence in the record which support[ed] Dr. Biglow's opinions and assigned limitations." (*Id.* at 15-16.) In particular, she points to where Dr. Biglow checked "Yes" to the question whether Ms. McQuade required "additional unscheduled rest periods during an 8 hour workday outside of a standard ½ lunch, and two 15 minute breaks," and hand-wrote in: "frequently to the bathroom due to microscopic colitis." (*Id.* at 16; Tr. 1004.) It is noted that an additional space where Dr. Biglow could estimate "how much additional time" she required on an average day was left blank. (Tr. 1004.) Ms. McQuade argues the stated "colitis related limitation" requiring breaks for frequent bathroom use "is supported by objective evidence, in stark contrast to the ALJ's assertion that no objective basis exists." (ECF Doc. 11 p. 16.)

In support of her argument that the ALJ failed to cite evidence to support his conclusions and ignored "objective evidence in the record" that supported Dr. Biglow's limitations (ECF Doc. 11 p. 16), Ms. McQuade cites March 2019 biopsies and a June 2019 CT enterography that were compatible with colitis. (*Id.* (citing Tr. 336, 338).) She also cites examination notes reflecting that she complained of frequent and worsening diarrhea to multiple providers, and her own testimony regarding her limitations due to her chronic diarrhea and the lack of benefit from medications. (*Id.* (citing records).)

Contrary to Ms. McQuade's arguments, a review of the ALJ decision reveals that he did explicitly acknowledge and consider her biopsy and CT enterography results, as well as her subjective complaints to providers and hearing testimony regarding her colitis and chronic diarrhea. In particular, he explained:

> The claimant has a documented history of severe physical impairments including systemic lupus erythematosus, seronegative rheumatoid enthesopathy, migraine, Hashimoto thyroiditis, irritable bowel syndrome with microscopic colitis, bursitis of feet, Raynaud's phenomenon, and mild obesity. She has a chronic history of

diarrhea sometimes up to 15 times per day according to her reports and medical records (1F/3; 2F/4).

\*\*\*

The claimant reported being diagnosed with microscopic colitis, but also had a normal upper endoscopy with biopsies negative for celiac disease, and colonoscopy with biopsies that demonstrated lymphocytic colitis (4F/12; 6F/2). She continued to report chronic issues with diarrhea and more recent fecal incontinence in March 2019, that had worsened over the past year (4F/12). She reported to providers that she experienced 10-12 watery urgent stools on a daily basis, worse after eating, and stated she cannot eat during the day without having multiple stools (4F/12).

\*\*\*

In March 2019, the claimant reported that she experienced bowel incontinence at night about once per week (1F/3; 2F/4). A colonoscopy from March 2019, revealed the terminal ileum was normal; the colon was normal on direct and retroflexed views; and random biopsies were obtained of both the right and left colon to evaluate for microscopic colitis (4F/28-29; 6F/8-10). Biopsy of the colon from March 15, 2019 revealed normal colon on testing (4F/10-11).

Treatment records note the colonoscopy from March 2019 demonstrated lymphocytic colitis and she continued to complain of chronic issues with diarrhea (6F/2) . . . She underwent further evaluation with a CT enterography, which suggested mild colitis but was otherwise normal (6F/11).

\*\*\*

On June 4, 2019, the claimant followed up with a CT Enterography due to pain, cramping, gas, diarrhea, and prior gastric sleeve (4F/8). The results showed somewhat featureless and diffusely fluid-filled colon with ascending and transverse wall edema are compatible with colitis; no small bowel involvement was identified; specifically, the terminal ileum and appendix were unremarkable; and there was no lymphadenopathy, pneumoperitoneum or abscess (4F/8-9).

(Tr. 22-24 (emphasis added).)

The ALJ also considered Ms. McQuade's subjective statements in her function report and hearing testimony regarding her colitis-related symptoms, including reports that she: could "use the toilet with no issues, but noted that due to her microscopic colitis and IBS-D, she may have 15-20 bowel movements each day and loses her bowels in her sleep once or twice per week" (Tr.

22 (citing Exhibit Tr. 212)); had "a chronic history of diarrhea sometimes up to 15 times per day according to her reports and medical records" (*id.* (citing Tr. 299, 312)); "reported that she [was] perpetually exhausted due to a combination of symptoms from her impairments"; and "reported that she experience[d] migraine headaches 15-20 days per month and due to her IBS-D she has 15-20 bowel movements each day (including 3-4 every night resulting in interrupted sleep and sleep deprivation)" (*id.* at 21 (citing Tr. 210-12 and hearing testimony)).)

The ALJ also considered testing in January 2019 that was negative for Giardia, cryptosporidium, stool culture, and C. difficile (Tr. 23 (citing Tr. 340, 374-78)), and noted that the June 2019 CT enterography "suggested mild colitis but was otherwise normal" (*id.* (citing Tr. 481)).  While acknowledging Ms. McQuade's reports of severe symptoms, the ALJ also considered reports that she was exercising at the gym five nights per week, walking, and weightlifting (Tr. 23 (citing 416, 427)), and driving herself to appointments, grocery shopping, and trying to walk around the block at night at least once a week (Tr. 22 (citing Tr. 214)).  He considered her relatively normal physical examination findings.  (Tr. 24 (citing records).)  And while he considered evidence that she discontinued medications due to lack of efficacy or reported side effects, he also considered evidence that she had not tried taking Imodium as recommended by her gastroenterologist.  (Tr. 23 (citing 472-73, 481, 484), 25 (citing Tr. 813).)

Ms. McQuade peripherally notes that the opinion also identifies "fatigue as a result of lupus, microscopic colitis, and above as noted" as limitations interfering with her ability to work. (ECF Doc. 11 p. 16 (citing Tr. 1004).)  This reference is briefly addressed herein to the extent it relates to Dr. Biglow's opinion regarding the need for additional unscheduled rest periods.[3]  As

---

[3] To the extent this reference was intended to pose a distinct and separate challenge regarding the ALJ's weighing of Dr. Biglow's opinion, it is undeveloped and the argument is waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal

with the gastrointestinal complaints, the ALJ acknowledged Ms. McQuade's complaints of fatigue, but concluded based on the evidence as a whole that her statements concerning the limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 22.)  After a detailed and thorough discussion of the record (Tr. 22-28), the ALJ explained:

> The pain, fatigue, effects of treatment, and residual functioning related to the claimant's systemic lupus erythematosus, seronegative rheumatoid enthesopathy, migraine, Hashimoto thyroiditis, irritable bowel syndrome with microscopic colitis, bursitis of feet, Raynaud's phenomenon, and mild obesity, support limiting the claimant to no more than light exertion, with additional limitations on climbing, postural activities, and exposure to hazards, as noted above.

(Tr. 28.)  Ms. McQuade has not presented evidence or argument to demonstrate that the ALJ failed to properly account for her allegations of fatigue in his analysis of Dr. Biglow's opinion.

After considering the entirety of the record, the ALJ acknowledged that the records "support some level of limitation" with respect to lifting, sitting, standing/walking, and breaks, but concluded that "the objective testing and physical exams do not support the level of limitation contained in [Dr. Biglow's] opinions."  (Tr. 27.)  He explained: "While the claimant ha[d] seen various physicians during the relevant period and attempted several treatments, the treatment records d[id] not contain objective medical findings or supported medical opinions that would support the level of disability alleged."  (Tr. 27.)  In arguing that these findings were not supported by substantial evidence, Ms. McQuade contends that the findings "ignore[] several years and multiple, consistent examining physicians reporting that Ms. McQuade does, in fact, have these conditions and restrictions."  (ECF Doc. 11 p. 17.)  This argument is contrary to the detailed discussion in the ALJ decision, as set forth above.

---

way, leaving the court to ... put flesh on its bones."); *Ray v. Saul*, No. 1:19-CV-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).

The undersigned additionally notes that that the ALJ was not "required to discuss each piece of data in [his] opinion, so long as [he] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  He was also permitted to rely on previously articulated information to support his opinion analysis.  *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

Ms. McQuade argues that the ALJ's findings "leave … this Court guessing as to why" the evidence outlined in the brief "was insufficient to render this report persuasive."  (ECF Doc. 11 p. 17.)  On the contrary, the ALJ clearly explained that the record did not contain "objective medical findings or supported medical opinions" to "support the level of disability alleged."  (Tr. 27.)   This explanation tracks the "supportability" factor the ALJ was required to consider, which provides: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) …, the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1) (emphasis added).  As applied in this case, the only "objective evidence" supporting her asserted need for frequent bathroom breaks included a colonoscopy showing a normal colon but colonic mucosa consistent with microscopic colitis (Tr. 338) and a CT enterography showing a "somewhat featureless and diffusely fluid-filled colon with ascending and transverse wall edema … compatible with colitis"

but otherwise unremarkable findings (Tr. 336-37), both of which were considered by the ALJ. (Tr. 23.) The only "supporting explanations" included in Dr. Biglow's "check-box and fill-in-the-blank form" (as described by the ALJ) supporting a need for unscheduled rest periods was the hand-written note: "frequently to the bathroom due to microscopic colitis." (Tr. 27, 1004.)

It is noted that the ALJ did not simply find that Ms. McQuade had no limitations due to her gastrointestinal impairment, but instead found that impairment would be adequately accommodated by RFC limitations that included a limitation to light exertional work with limited climbing and postural positioning, no exposure to hazards, and "ready access to restroom facilities, so no work outdoors." (Tr. 21.) Ms. McQuade's argument that the ALJ should have found Dr. Biglow's opinion required greater limitations amounts to a request that this Court consider the evidence evaluated by the ALJ, and weigh it differently. Even if a preponderance of evidence supported Ms. McQuade's interpretation of the evidence, this Court could not overturn the Commissioner's decision because "substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

The undersigned finds the ALJ clearly articulated his basis for finding Dr. Biglow's opinion "not persuasive," and that his findings were supported by substantial evidence.

### 3. Whether ALJ Erred in Evaluating Treating Rheumatologist's Opinion

As to Dr. Morales-Mena's November 2020 Medical Source Statement (Tr. 1014-15), Ms. McQuade argues the ALJ's analysis of that opinion suffers from the "same deficiencies." (ECF Doc. 11 p. 17.) She notes that Dr. Morales-Mena is a specialist in treating auto-immune disorders who treated her for multiple years and referred her to other specialists. (*Id*.) She also highlights objective evidence that she believes supports Dr. Morales-Mena's opinion, noting that she documented positive examination findings in her treatment records, including "tenderness

(Tr. 424, 597), edema and tenderness (Tr. 432), [and] moderate to severe tenderness in the

fingers, wrists, shoulders, knees, and feet, with swelling noted throughout the joints (Tr. 986),"

which findings were consistent with findings of other physicians, and that the record also

contains "blood work documenting evidence of seronegative RA and Lupus (Tr. 503, 516) and

the CT Enterography and Biopsies documenting proof of colitis (Tr. 336, 338)."  (*Id.*)

  As with the prior opinion, the ALJ's decision provides a detailed analysis of much of the

information highlighted in Ms. McQuade's brief.  In particular, he discussed her rheumatological

complaints, treatment, and physical examination findings as follows:

> The claimant has a documented history of severe physical impairments including systemic lupus erythematosus, seronegative rheumatoid enthesopathy, migraine, Hashimoto thyroiditis, irritable bowel syndrome with microscopic colitis, bursitis of feet, Raynaud's phenomenon, and mild obesity. She has a chronic history of diarrhea sometimes up to 15 times per day according to her reports and medical records (1F/3; 2F/4). She has been diagnosed with lupus and rheumatoid disease and described tingling numb feeling of tightness like feeling in her feet at times (1F/3).

> \*\*\*

> The claimant also followed with a rheumatologist during the relevant period for rheumatoid arthritis, lupus, and pain (5F/10-13, 19-22, 30-33). She reported feeling very fatigued, having headache symptoms, had a rash on her chest and fast that resolved after 2 days, increasing joint pain in her hands and feet, and increased stress with her mother's health and her work (5F/30). In April 2019, she reported that meloxicam helped with joint pain, but also reported she was dropping things, but noted no numbness (5F/10). She also reported joint pain in her left fingers with some swelling and stiffness, and physical exam findings noted some tenderness but no edema, normal range of motion, normal strength, no sensory deficit, and normal gait (5F/11-12).

> \*\*\*

> Physical exam findings from October 2019 noted she had some tenderness in the hands bilaterally and diffuse soft tissue swelling, but findings were otherwise normal noting she walked with normal gait and station (12F/15).

> \*\*\*

Physical exam findings were generally unremarkable during the relevant period. Physical exam findings from September 2019 noted she was oriented, appeared in no distress; neck was supple and no thyromegaly present; cardiovascular and pulmonary exams were normal; abdominal exam revealed soft, normal bowel sounds, no distension and no mass, and no hepatosplenomegaly, splenomegaly, or hepatomegaly; no tenderness or rebound on abdominal exam; she had normal range of motion and no edema or tenderness on musculoskeletal exam; and she had normal mood, affect, behavior, and thought content (5F/6, 12, 17, 28, 31; 12F/15, 22-23; 26F/9). She also reported that her lupus seemed to be under "better control" and was maintaining on medication including Plaquenil during the relevant period (12F/13).

\*\*\*

In April 2020, the claimant started sulfasalazine to see if it would help with inflammatory arthritis in addition to her chronic diarrhea (15F/13, 16). At a follow up in July 2020, the claimant reported significant adverse medication side effects related to sulfasalazine (19F/2). Treatment records indicated she was tolerating Plaquenil and on meloxicam in July 2020 and there were plans to potentially start a biologic (19F/2). Treatment notes from a follow up on October 5, 2020 indicated she was recently started on Benlysta for management of her lupus, and with that injection she reported a significant increase in headaches (26F/7).

(Tr. 22-25.)  In his analysis, the ALJ specifically discussed several treatment visits with Dr. Morales-Mena that were cited by Ms. McQuade.  (*Compare* ECF 11 p. 17 (citing Tr. 424, 432, 597, 986) *with* Tr. 23-24 (citing Tr. 422-25, 431-34, 442-45).)  While he did not specifically discuss the physical examination findings of July 6, 2020 or the bloodwork documenting evidence of seronegative RA and lupus (Tr. 503, 516, 984), he was not "required to discuss each piece of data in [his] opinion, so long as [he] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley*, 397 F. App'x at 199.  The record does not support a finding that the July 2020 exam findings or the bloodwork had to be discussed for the ALJ to reach a reasoned conclusion, particularly since RA and lupus had already been found to be severe impairments and other physical examination with findings of tenderness were discussed.

Dr. Morales-Mena opined that Ms. McQuade had significant physical limitations that included: lifting or carrying no more than five pounds; sitting, standing, or walking less than 20-

30 minutes at a time; rarely climbing, balancing, or stooping; never crouching, kneeling, or crawling; occasionally reaching, pushing, pulling, or manipulating; environmental restrictions; and required "additional unscheduled rest periods" without specifying the amount of rest time needed.  (Tr. 1014-15.)  In analyzing the persuasiveness of this opinion, the ALJ stated:

> The undersigned specifically rejects and does not find persuasive the unsupported "checklist" medical opinions contained on this form (30F). While the claimant has seen many physicians and tried various treatments for her symptoms, <u>none of these physicians have reported objective medical findings or offered supported medical opinions that would support the claimant's allegations of disability</u>. The records are consistent with some limitation in handling and fingering based on tenderness on physical exam of hands and treatment with rheumatology throughout the period, but <u>the records do not support the level of limitation opined by Dr. Morales Mena</u>. The records overall support some level of limitation, which has been accounted for in the residual functional capacity including limitation to ready access to restroom facilities, but <u>the physical exam findings and objective testing during the relevant period do not support the disabling functional limitations alleged</u>.

(Tr. 27-28 (emphasis added).)

As explained in Section VI.B.2.ii., *supra*, the ALJ was not required to rearticulate previously stated information to support his analysis, *Crum*, 660 F. App'x at 457; *Bledsoe*, 165 F. App'x at 411, and had already outlined Ms. McQuade's treatment history, objective testing, physical examination findings, and subjective reports (Tr. 22-25).  Thus, when he stated that "the records are consistent with some limitation in handling and fingering based on tenderness of physical exam of hands and treatment with rheumatology throughout the period" and that the "records overall support some level of limitation, … including limitation to ready access to bathroom facilities" (Tr. 27-28), he had already outlined the treatment history and physical examination findings that supported such limitations (Tr. 22-25).  And conversely when he found no "objective medical findings or … supported medical opinions" substantiated the level of limitation described by Dr. Morales-Mena – including an inability to sit, stand, or walk for more than 20-30 minutes, lift over five pounds, or use her upper extremities over one third of the

workday – he had already outlined the largely normal physical examination findings that he found inconsistent with that level of limitation.

The ALJ's explanation again tracks the "supportability" factor, which provides that medical opinions are more persuasive when the source provides: "more relevant [] objective medical evidence and supporting explanations" in support of the opinion findings.  20 C.F.R. § 404.1520c(c)(1) (emphasis added).  As to the "objective evidence," the ALJ stated the objective findings of "tenderness" on examination and rheumatological treatment were "consistent with some limitation in handling and fingering," and that other findings supported a "limitation to ready access to bathroom facilities," but that the evidence did not support the more extreme limitations described by Dr. Morales-Mena.  (Tr. 27-28.)  As to the "supporting explanations," the ALJ noted that the opinion was a "check-box form" and a "'checklist' medial opinion."  (Tr. 27.)  The undersigned observes that Dr. Morales-Mena did add hand-written notes to outline supporting "medical findings," but those findings were generally restatements of the record information previously outlined by the ALJ, including diagnoses, subjective complaints, and objective findings (colitis per biopsy, CT scan).  (Tr. 1014-15.)

In the end, the ALJ weighed and considered the entire record and concluded that Dr. Morales-Mena's opinion was not persuasive because it was not supported by or consistent with the record as a whole.  Ms. McQuade's argument that the ALJ should have found the opinion more persuasive effectively asks this Court to consider the same evidence evaluated by the ALJ, but weigh that evidence differently.  Even if a preponderance of evidence supported Ms. McQuade's argument, this Court could not overturn the Commissioner's decision "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

Based on a review of the underlying records and the ALJ decision as a whole, the undersigned finds the ALJ clearly articulated his grounds for finding Dr. Morales-Mena's opinion was not persuasive, and that his finding is supported by substantial evidence.  For the reasons set forth above, the first assignment of error is found to be without merit.

**C.      Second Assignment of Error: Whether ALJ Erred by Not Including RFC Limitations for Unscheduled Breaks, Off Task Behaviors, and Absenteeism**

In her second assignment of error, Ms. McQuade argues that the ALJ erred by not including RFC limitations for unscheduled breaks, off-task behavior, and absenteeism.  (ECF Doc. 11 pp. 19-21.)  The Commissioner argues in response that the ALJ reasonably determined that Ms. McQuade could perform a reduced range of light work.  (ECF Doc. 12 pp. 9-11.)

A claimant's "residual functional capacity is the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing See 20 C.F.R. §§ 404.1546(c), 416.946(c)).  An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in [the] case record."  20 C.F.R. § 404.1545(a)(1).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe*, 342 Fed. App'x at 157.

Here, the ALJ found Ms. McQuade had the RFC to perform light work with the following additional limitations:

- cannot climb ladders, ropes, or scaffolds and cannot crawl;

- can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch;

- can frequently handle and finger;

- cannot be exposed to concentrated vibration or high background noise;

- cannot be exposed to hazards (heights, machinery, commercial driving);

- must have ready access to restroom facilities, so no work outdoors.

(Tr. 21.)  Ms. McQuade argues that these limitations are not enough for three reasons.

First, she challenges the RFC finding that she "must have ready access to restroom facilities, so no work outdoors."  (Tr. 21.)  She argues this limitation is insufficient to address her needs for "immediate access to a bathroom indoors."  (ECF Doc. 11 p. 20.)  In support, she cites to her own testimony that she needs ten to fifteen visits to the restroom per day.  (*Id.*)  She asserts that the ALJ's RFC limitation is inadequate because it "does not account for frequency or urgency."  (*Id.*)  However, it is well-established that the ALJ was not required to accept Ms. McQuade's subjective allegations as true or incorporate them into the RFC.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints.").  A review of the ALJ decision reveals that he considered her subjective reports and found them "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision."  (Tr. 21-22.)  He explained that while "the evidence of record, the medical evidence, the claimant's testimony, the claimant's activities … support some functional limitations … they do not fully support the allegations regarding the severity or frequency of symptoms."[4]  (Tr. 28 (emphasis added).)

It is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence." *Garner*, 745 F.2d at 387.  The ALJ decision reflects that he considered her reports regarding the frequency of her gastrointestinal symptoms, but also considered the following factors in assessing the intensity, persistence, and limiting effects of those symptoms:

> The undersigned notes that while the record shows the claimant experiences
> symptoms from her conditions, treatment plans during the relevant period were

---

[4] Ms. McQuade has not articulated a direct, developed, or clearly articulated challenge to the ALJ's evaluation of her subjective allegations regarding symptoms, and any such challenge is waived.  *See McPherson*, 125 F.3d at 995-96.

persistent yet conservative in nature, involving outpatient office visits for
medication management; monitoring of various conditions with specialized
providers including rheumatology, neurology, and primary care; objective testing
and imaging; and treatment with injections and various medications.

\*\*\*

Additionally, despite the claimant's reports of disabling symptoms, she also
reported that she is able to perform activities of daily living including personal care,
household chores, prepare simple meals, and care for her mother with health
conditions of her own. Overall, the record did not demonstrate extensive or repeated
hospitalizations, emergency room visits related to her severe impairments, invasive
procedures, or required physician intervention. Therefore, the undersigned
concludes that the record does not establish limitations of the level and severity as
the claimant alleged and that would preclude all work activity. While the record
supports some degree of limitation from the claimant's impairments for the relevant
period, the exam findings, imaging, and testing do not support a greater degree of
limitation than that which is set forth in the above residual functional capacity
assessment.

(Tr. 25-26.)  Ms. McQuade has not identified evidence the ALJ failed to consider or

demonstrated that he mischaracterized pertinent evidence.  In support of his findings, the ALJ

highlighted Ms. McQuade's limited objective findings (as discussed in the prior assignment of

error), the conservative nature of her treatment, and the evidence concerning her activities of

daily living, and concluded that ready access to restroom facilities with no outdoor work

adequately accounted for these limitations.  This finding was supported by substantial evidence,

and thus falls within the "zone of choice" within which the ALJ was permitted to make his

decision "without interference by the courts."  *Blakley*, 581 F.3d at 406.

Second, Ms. McQuade argues that the RFC limitations restricting her exposure to

vibration and high background noise were insufficient to account for her headache symptoms.

(ECF Doc. 11 p. 20.)  She acknowledges the ALJ considered her reported symptoms and

evidence that medication did not relieve her headache symptoms.  (*Id*. (citing Tr. 17, 25).)

Indeed, the ALJ provided a thorough discussion of her headache impairment as follows:

45

The claimant also has a history of headaches for quite some time (1F/3). She reported no head injury and that she started having headaches in her teenage years and in her 20s (1F/3). The headaches typically occur around the menstrual cycle and she reported throbbing sensation but no blindness or paresthesias or paralysis or visual disturbance, and no speech or swallowing difficulty with them, but reported sometimes she had blurry vision (1F/3-4; 2F/4). Treatment records note the claimant attempted various medications including Imitrex, Excedrin, and Topamax, but did not report significant relief from these medications (1F/3; 2F/4). A CT of her brain from May 2017 noted no CT evidence of acute intracranial abnormality (1F/11-12; 2F/5). An MRI of the brain from February 5, 2019 showed no significant change from the previous study of March 31, 2016, with nonspecific gray white matter changes within the brain and prominent perivascular spaces noted with the basal ganglia; MRA brain did not show any significant abnormality (1F/4, 8-10; 2F/5-6; 4F/43-44; 9F/45-46). Treatment records from March 13, 2019 noted she had multifactorial headache including tension type headache, migraine, stress related headache, and also noted she might have underlying microangiopathy related to lupus (1F/4-5; 2F/5-6). Ophthalmic testing in April 2019 revealed normal findings and normal testing results (3F/8-10). In October 2019, the claimant reported that Botox injections helped relieve her headache symptoms for approximately 90 days, but a second set did not seem to be helping as much (1F/6). She followed with neurology during the relevant period for headaches, and was given a prescription for Fioricet and treated with botox for headache management every three months (15F/13, 16). In September 2020, the claimant reported that while she was doing fairly well responding to Botox treatments, the prior 5 weeks she had persistent head pressure and blurry vision but no blindness (22F/12). She reported that using Flonas for her sinuses seemed to be helping somewhat and she had not been having significant migraine recently (22F/12). Treatment notes suggest that she might have tension type headache and may be sinus inflammation causing persistent headache, and continued use of Fiorinal was reasonable as needed (22F/13). Notes also indicate concern for use of Emaglity along with Benlysta for her lupus flares (she reported self-injection every two weeks) (22F/13).

(Tr. 24-25.)  The ALJ then analyzed the intensity, persistence, and limiting effects of Ms. McQuade's symptoms, and found her subjective statements to be "not entirely consistent with [her] reported daily functioning, examination findings of record, and the weighted portions of the medical opinions."  (Tr. 25.)  He noted her treatment plans "were persistent yet conservative in nature," she remained able to perform specified activities of daily living, and she did not require

"extensive or repeated hospitalizations, emergency room visits …, invasive procedures, or required physician intervention."[5]  (Tr. 25-26.)

Despite the ALJ's clearly articulated findings regarding her headaches, Ms. McQuade contends he erred in providing "no restriction in the RFC for the consequences of working with/during these headaches or, alternatively, missing work as a result."  (ECF Doc. 11 p. 20.)  It is again observed that "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician," *Poe*, 342 F. App'x at 157, and the ALJ was not required to accept Ms. McQuade's subjective allegations as true or incorporate them into the RFC, *see Jones*, 336 F.3d at 476.  Ms. McQuade neither identified evidence the ALJ failed to consider nor demonstrated that the ALJ mischaracterized pertinent evidence.  Upon a review of the decision as a whole, it is clear that the ALJ considered and weighed the relevant evidence in assigning RFC limitations relating to the headache impairment, and that his RFC determination was supported by substantial evidence.

Third, Ms. McQuade argues that the ALJ did not sufficiently account for the "overwhelming and significant fatigue" caused by her auto-immune disorders in the RFC, arguing that her fatigue "would result in absenteeism or off-task behaviors, as identified by both the treating physician and the treating rheumatologist."  (ECF Doc. 11 p. 20.)  As with her other reported symptoms, the ALJ did not ignore her reports of fatigue.  (*See, e.g.*, Tr. 21 ("claimant reported that she is perpetually exhausted due to a combination of symptoms from her impairments"), Tr. 22 ("reported she sleeps 10-12 hours each night and take a one hour nap twice per day"; "she cannot be exposed to sunlight due to her Lupus, explaining sunlight amplified her

---

[5] It is again noted that Ms. McQuade has waived any direct challenge to the ALJ's evaluation of her subjective allegations regarding symptoms.  *See McPherson*, 125 F.3d at 995-96.

chronic fatigue"; "she may not have energy to wash or fix her hair or shave for a couple days or more"), Tr. 23 ("She reported experiencing fatigue"; "She reported feeling very fatigued")).)

Nevertheless, the ALJ found her subjective statements to be "not entirely consistent with [her] reported daily functioning, examination findings of record, and the weighted portions of the medical opinions," and noted that her treatment plans "were persistent yet conservative in nature," she remained able to perform specified activities of daily living, and she did not require "extensive or repeated hospitalizations, emergency room visits …, invasive procedures, or required physician intervention." (Tr. 25-26.)

In particular, the ALJ considered her reports that she was able to drive herself, grocery shop, attend to small household chores, exercise at a gym five nights per week, and care for a mother who had her own health conditions. (Tr. 18 (discussing activities of daily living (citing function report (Tr. 210-17), hearing testimony (Tr. 40-54), neuropsychological report (Tr. 1007-11)), Tr. 22 (self-report of doing laundry, preparing meals, vacuuming, driving to doctors and pharmacy, grocery shopping, and walking around the block (citing function report)), Tr. 23 ("She … stated she tries to eat healthy and exercises by going to the gym 5 nights per week, walking, and weight lifting." (citing Tr. 416, 427)), Tr. 26 ("she also reported that she is able to perform activities of daily living including personal care, household chores, prepare simple meals, and care for her mother with health conditions of her own"); *see* Tr. 548 ("Patient is the sole caregiver of her mother"; "Her mother is not on the transplant list").)

He also considered evidence of generally unremarkable examination findings, conservative treatment, and reports that her rheumatological impairments were under better control with medication. (*See, e.g.,* Tr. 24 ("She also reported that her lupus seemed to be under 'better control' and was maintaining on medication including Plaquenil during the relevant

period" (citing Exhibit Tr. 678)), Tr. 24 (discussing generally unremarkable examination

findings (citing *inter alia* Tr. 418, 680).)  With respect to the medical opinions Ms. McQuade

cites as further support for a requirement that her RFC include absenteeism or off-task behavior

(ECF Doc. 11 p. 20), the undersigned already explained in Section VI.B., *supra*, that the finding

that those two opinions were "not persuasive" was supported by substantial evidence.  That

determination will not be revisited here.

 With respect to her complaints of fatigue, Ms. McQuade has neither identified evidence

the ALJ failed to consider nor demonstrated that the ALJ mischaracterized pertinent evidence.

She also failed to demonstrate that the ALJ did not account for her fatigue when he restricted her

to light exertional work with additional postural, manipulative, and environmental limitations.

Upon a review of the decision as a whole, it is clear that the ALJ considered the relevant

evidence in assigning RFC limitations for her rheumatological impairments, and that his ultimate

RFC determination was supported by substantial evidence.

 A review of the ALJ's decision as a whole reveals that he considered the entirety of the

record, including Ms. McQuade's subjective reports regarding the severity and frequency of her

symptoms.  Because it is not a reviewing court's role to "try the case *de novo*, nor resolve

conflicts in evidence," *Garner*, 745 F.2d at 387, this Court cannot overturn the Commissioner's

decision "so long as substantial evidence … supports the conclusion reached by the ALJ."

*Jones*, 336 F.3d at 477.  As recently explained by the Sixth Circuit:

> [A]t issue in social security cases is not whether [the court] would have reached the
> same decision on [the] record.  When determining whether to affirm the
> Commissioner's decision, [the court] need not "agree with the Commissioner's
> finding"; [the court] instead ask[s] whether the decision followed legal standards
> and "is substantially supported in the record."

*Bowers, v. Comm'r of Soc. Sec.*, No. 21-4069, 2022 WL 1277703, at *1 (6th Cir. Apr. 29, 2022)

(citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)).)  Here, although Ms.

McQuade reported significant limitations due to chronic diarrhea, migraines, and fatigue, she has not met her burden to demonstrate that the ALJ lacked substantial evidence to support his finding that those symptoms were not entirely disabling, and that Ms. McQuade could perform work within the limitations of her assigned RFC.

For the reasons set forth above, the undersigned finds the ALJ's RFC was supported by substantial evidence, and that Ms. McQuade's second assignment of error is without merit.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.


June 2, 2022                          */s/ Amanda M. Knapp*
                                       AMANDA M. KNAPP
                                       UNITED STATES MAGISTRATE JUDGE

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).